Good morning, Your Honors. Good morning. May it please the Court, Deputy Attorney General Randy Zak, on behalf of Defendants Appellate. Counsel, before you begin, I just want to make certain, has the stay motion been renewed before the Mayor's panel? Yes, Your Honor. This panel granted that motion in a one sentence. Oh, okay. So the stay motion is in effect. That's correct, Your Honor. The stay is in effect. I confused you, I'm sorry. You did confuse me, but I'll try to get back on track. I'm going to try to reserve five minutes for rebuttal, but I'll see how well I do. Defendants' tremendous efforts over the last 25 years have resulted in California inmates having better access to mental health providers than California's general adult population. Well, Counsel, the reason for that is the state has taken them into custody. And so once the state takes someone into custody, they have the responsibility for them. You don't have the responsibility for the general populace, but because you've taken them into custody, then that imposes upon you the obligation to meet their constitutional needs. They don't have that. You don't have that obligation for the general populace, but you do have that for the people you've incarcerated. Defendants do not disagree with that. Defendants are not trying to shirk their duties to provide Eighth Amendment adequate health care, mental health care, by any means. But that isn't the only reason California inmates have better access to mental health care providers. The reason is because defendants have made great strides since the early 1995 judgment. Let's stipulate that's right. Let's stipulate the state certainly tried to do some things and spent some money. But do you contend that the state actually complied with the district court's orders? And specifically, do you challenge the determination by the district court that they did not comply? Defendants do not contend that they fully complied with the 10 percent vacancy rate. Okay, so if that's the case, then it really gets down to what the defenses might be. Impossibility is one of them. Let's start with that. Sure. Does impossibility require absolute impossibility, or is it just what might be reasonable? What's the standard we look at here? In our view, the standard is it doesn't require literal impossibility, and I think Falstaff teaches that in two ways. One is Falstaff says for impossibility you have to weigh all the evidence. And if it was literal impossibility, all of the evidence wouldn't matter. Only the one fact that made it impossible would matter. So in Falstaff, for example, that would be was the document actually destroyed or was it outside of their possession in some manner. That's not what Falstaff did. Falstaff looked at all the evidence, including the party's attempt to find the documents and its counsel's attempt to find the documents, and said based on all of that evidence, we think it's impossible. Okay, so I know I have a tough issue here, but so this has been going on forever, but we're talking here about a 2017 order, all kinds of pushes and shoves and trying to get people to comply. And finally the judge says, you know, I'm putting you on notice here. I'm done with this. I need you to comply. And you did some things, but you didn't do all, and you conceded that. So what I'm struggling with here is we've got an order by the judge who's trying to get you to fully comply with the order. Let's assume hypothetically the order was 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and you say, hey, we complied with 8. The judge says, no, no, you've got to do 9 and 10 as well. What's your best argument that under applicable law, complying with 8 but not 10 in my hypothetical is enough? So I think I want to clarify just one concession. Defendants do not concede that they didn't take all reasonable steps, which is a separate. I understand that. But what I thought you said was you didn't take all that the judge ordered you to. You said you took all reasonable steps. That's different. Correct. Okay. I just wanted to clarify that. But in terms of impossibility. In terms of impossibility. And I guess Your Honor's question goes to substantial compliance as well. Yeah. Because I think they do provide context. Those are two different issues. Impossibility, what's your best argument, that it was impossible for the state to comply with the order? Yes, Your Honor. And I think it goes back to the contextual and all evidence requirement that FALSTAFF requires the district court to undertake. And that is defendants achieved pretty good, but I agree, not perfect results in the context of a mental health provider shortage, trying to hire at a correctional institution, and with, amongst other things, some of their hands tied behind their back because of the program guide and other requirements that make it less attractive to work at CDCR as opposed to other places. And this is not unique to CDCR. It's not even unique to public institutions. Private, Kaiser and many other private institutions, I think is a well-known fact, cannot hire enough mental health care providers. And that does not mean, as Your Honor pointed out earlier, that we're trying to shirk our duty. I never said that. I never said you were trying to shirk your duty. I just asked you what. So impossibility, I think, is a contextual analysis, and I think our defendants' efforts over the past 25 years, because that's how long back the nationwide mental health provider shortage has been going, plus all of their efforts in the last five years, have shown that the task is currently impossible. Can we talk about some of those efforts? One of the ones that stood out to me was working conditions. That's not something that is beyond the control of the state. And there were some references in the record that jail cells were made into offices for the psychologists and psychiatrists. There was no heating and air in some of them. There were vermin in some of them. And so that's something that the state could easily remedy, and why wouldn't that be a failure to use reasonable efforts to attract people? If you have working conditions that are less than ideal, even if you hire people there, if their working conditions are intolerable, they're not going to stay. Yes, Your Honor, and I'm glad you brought up working conditions because I do think it is a factor. I think it's a factor that in some ways are immutable and in other ways perhaps not immutable. And no matter what, if you're working for CDCR, you're working at a correctional institution. And some of those working conditions, none of the ones necessarily you mentioned, but working conditions for a correctional institution are necessarily unchangeable. What about the ones I mentioned? Why would a psychologist or a psychiatrist have to work in a jail cell? I can't speak directly to why they would or would they not, but I do know that CDCR provides substantial salary premiums compared to private institutions and other nationwide and state. What does that have to do with the working conditions? Well, I think salaries is a large factor about where somebody chooses to work. Working conditions are a large factor as well. I agree. And I think to go back to working conditions, as Your Honor pointed out, other things could have made it easier for CDCR to hire more people, like telework and telepsychiatry. But those things were limited by the district court. Again, tying CDCR's hands behind the back while imposing on it a task that in our view was impossible. What I struggle with, Doctor, and I may be saying her name wrong, Dr. Grulich, I think, was really your primary witness. About to the labor economist, she talked about things, talked about things that the state had done, but clearly and candidly admitted that the state had not done everything that it could do. Part of it was what my colleague just mentioned in terms of working conditions. She did not think it was impossible for the state to hire sufficient social workers. So what do we do with that? Because I didn't see anybody besides her that said that compliance with the 2017 order was, in quotes, impossible. Yes, Your Honor. So I think a couple of points. I don't read Dr. Grulich's, maybe it's Dr. Grulich, I'm not sure. Well, we'll call her Dr. G. I'm not sure she'll appreciate that. I don't read Dr. Grulich's testimony as saying that it is possible to comply, nor do I read her testimony as saying there are other steps that CDCR or defendants could take. But is it fair to say she said it's not impossible? She said that it depends, I think is what she said. She said it is possible, certainly, for some employers, including CDCR, to hire more employees. But that doesn't mean it's possible to hire and retain those hundreds of employees that defendants would need and CDCR would need in this case. Let's just say, I'm going to cite you to the record here, what I saw was that she was saying at 5 S.E.R. 1289-90 and 5 S.E.R. 1290-91 that it was possible to hire sufficient social workers and medical assistants. So just take those two, for example. Nobody else testified about that. So you've got the state's own witness saying, no, it's not impossible to do this, you can do that. What do we do with that? Sorry, Your Honor. If I remember that testimony correctly, I can go back and grab it. But my memory of that is that she was saying, given these statistics that plaintiff's counsel gave, which does not take into account the facts that actually mattered in terms of how many social workers were already employed, how many social workers were looking for a job, how many social workers would work at a prison to begin with, how many social workers would work in locations where prisons were located. So I think Dr. Gruelich testified about theoretical possibility there. Well, that's not the way I read it. I mean, first of all, we're dealing with a specific number, which is the 2017 order said a 10% vacancy rate. The state clearly didn't do that. And that's what Dr. Gruelich testified about, if I understand it. She originally testified about all the things that she had done, and the court acknowledged that. But then she talked specifically about these things that could be done with respect to social workers and medical assistants and so on. She also talked about the conditions that my colleague talked about that were easily rectifiable. And as I understand it, the state seems to concede that's the case. So what we're dealing with is my example of the you've got eight, but you need 10, according to the district court. And what do we do with that? So I want to maybe take that in two parts, if I can. Okay. The first part is Dr. Gruelich was employed by defendants to talk about compensation-related measures. So she had no knowledge or expertise. Let's say nobody else talked about anything other than her. I don't think that's true, Your Honor. Dr. Mehta, one of the defendants here, testified extensively, and so did other defendants in charge of HR staffing, testified during. About staffing issues? About staffing issues, yes, Your Honor. But then I also want to talk to you, because I guess I didn't get to it before, the 8 out of 10 example. And I think that really goes to both substantial compliance and impossibility. But we've talked about impossibility kind of extensively at this point. So I want to focus on substantial compliance. And what's our standard of review on that? If the district court made a finding that there was not substantial compliance, what's our standard of review? If the district court correctly set the full compliance level, then it would be abuse of discretion. But here the district court did not correctly set the full compliance level. And that's because it misinterpreted its prior orders, which said you have to meet 10%. And it said, no, those orders, in fact, mean 0%, and substantial compliance means 10%. Well, are you saying that you met the 10%? No, Your Honor. Well, it doesn't matter how she interpreted it. If you didn't even meet the 10% that you acknowledged was the standard, it doesn't matter if she changed it, right? Right, Your Honor. Sorry. It does matter for the substantial compliance analysis because if full compliance is 10%, as it should have been, and as the court's prior order said so, then substantial compliance must be something less than 10%. And the district court has said, find defendants for every vacancy below that 10% vacancy. Well, I think I read the state as saying the 10% was kind of a grace. It should be complied with fully, but she would give you the leeway of 10% would be substantial compliance. That is not the state's position. That is plaintiff's position. The state's position was all previous orders, including the ones leading up to the contempt proceedings, said 10% is the full compliance level. Okay. So where can we go in the record to confirm that 10% would be a complete compliance? Yes, Your Honor. We cited numerous orders in the brief. Okay. Give me the strongest citation to support the argument that 10% vacancy rate would be full compliance. Yes, Your Honor. Volume 7 ER 1451. ER 1451? That's correct, Your Honor. Okay. And that was the original 2002 order saying 10% is compliance. And it says defendants must maintain the vacancy at a maximum of 10%. And it doesn't say anything about substantial compliance. It doesn't say anything about 0%. And then that same 2002 order, setting the 10% level, is repeated and quoted in later orders by the district. Okay. So in your view, if the 10% vacancy is full compliance, what would be substantial compliance in your view? So in our view, substantial compliance could be what defendants have done here, which is achieve or nearly achieve that full compliance level. Well, what nearly achieve wouldn't be it. If you say 10% is what the court said is full compliance, then if you had – so in my view, the State is saying we had full compliance for some jobs at some periods of time. Is that correct? I think that is one of the things substantial compliance looks at. Yes, the State did not fully comply for all the years as necessary. For any of the years did the State fully comply? We got – the State in 2021 – That's a yes or no. For any of the years did the State fully comply? No, Your Honor. Not that I'm aware of. There might have been, you know, one or two months, but not – I want to be sure we don't let this concept of substantial compliance take control here because I think you're relying upon Chairs v. Burgess, which is an 11th Circuit opinion, which I would argue is perhaps overturned by the Supreme Court's opinion in Turner. But our own case law in file staff, in affordable media, in Hook and so on suggests that impossibility means it's not physically possible. You couldn't do it. And it's not substantial compliance. And to my colleague's point, 10% is 10%, and that's not hard to understand. Either you complied or you didn't comply. Isn't that right?  Yes, Your Honor. I think there's two clarifications. We do cite Chairs for impossibility. We rely on this Court's decision in labor community for substantial compliance. And labor community says you're supposed to holistically look at all the evidence. And in labor community, full compliance under the consent decree, this Court pointed out that was only 9%. And yet it affirmed the district court's order of finding substantial compliance. Despite full compliance, only 9% of the time. But to Your Honor's question about impossibility, you are correct that we do cite Chairs and we also cite file staff. And I think file staff supports defendants here just as much as Chairs does. Because as the dissent pointed out in file staff, there was no evidence that the documents that needed to be returned had been destroyed. And the dissent also pointed out that the district court had at least implicitly made a finding that it was possible to return those documents. They were somewhere there. But the majority said no. That defendants had sufficiently said, sufficiently shown impossibility because of the steps they had taken to search for it. I guess what I struggle with, I mean, I don't question your good faith. You're a good lawyer. But this has been going on for so long. In this particular case, 2017, what more could the district judge do to get you all to comply other than have this order and 10% is 10%, it's pretty easy to figure out what is required and your own people and you in candor concede that technically you did not comply. You're saying you made substantial efforts. But the question is, is that what's reasonable here? Is that what we're talking about? What's your best argument? Maybe it's Chairs, I don't know. But what is your best argument that we should not take the 2017 10% order at its face? It's not hard to understand. You didn't comply with that. So what do we do with that? So I think there's a lot baked into that question. But I think our best argument is that even if the district court was frustrated by defendants' inability to comply fully with the 10% staffing rate, the district court was not entitled to impose $170 million in fines plus millions more without providing the appropriate due process. And the appropriate due process here was criminal protections, criminal due process protections including the right to a jury, proof beyond a reasonable doubt, and indeed a willfulness finding, which the district court never made and never gave the jury. What's your best case to support your argument that this case rose to the level of a criminal contempt? I think Bagwell speaks directly to the facts here. The district court imposed retrospective fines for actions that defendants took or inactions that defendants took in past months from April 2023 to May 2024, $120 million in fines for actions that defendants can't change. But basically, if I understand correctly, the parties have agreed on where those monies would go, which is basically to pay for what needed to be done, right? Defendants were ordered to meet and confer with plaintiff's counsel to determine, like to figure out how to spend these money. That's not a concession. So this is not money that would go to the court for parties and fixing up the building or whatever. This is to go to the very thing that the court ordered you to do in the first place. That is correct. We have some disputes about what those issues are, but I'd like to talk about perhaps a more important issue, which is just because the court has designated a use for the funds doesn't mean it's not a criminal sanction and a punitive sanction, and it doesn't make it a coercive sanction. So that use of the funds— How is it punitive if it's remedial? The Bagwell doesn't say that just because you're using the funds for some other purpose that might be remedial, they are civil. Bagwell says something different. It says there are hallmarks of criminal contempt and punitive sanctions, and one of them is was there a purgeability, and there was no purgeability here. That's one factor. That's one factor. The other one is seriousness, and it can be beyond dispute that $170 million in fines are very serious. It trumps anything, any of the previous cases that I've found that discuss seriousness. Another factor was were the violations for out-of-court conduct of a complex injunction. That is also true here. And then another factor, which Bagwell talked about, was a complex factual finding needed, and here there was four days of testimony, including two expert witnesses and numerous exhibits. That is the exact sort of factual finding that juries are made for. Was this argument made to the district court that this was a criminal? Yes, Your Honor, and I think it's— What was the district court's ruling on that? So the district court rejected the argument before hearing any briefing whatsoever. In June 2023, before the criminal contempt proceedings began— Well, they weren't crumpled with that. I'm sorry. I guess I bought my own Kool-Aid here. Yeah, you did. You drank it. Before the contempt proceedings began, the district court issued an order saying both parties brief how they should go forward. Defendants, tell me what defenses you plan on raising. But defendants, do not raise that this is criminal contempt proceedings because I will not entertain arguments about that. The district court said that. And defendants tried to do the best they could, given that order. In their closing brief, they cited to Bagwell, they cited to Falstaff and said, if these are going to be civil proceedings like you told me they were, you have to provide a purge clause, district court. You have to provide a subsequent opportunity after the contempt order for us to purge. And the district court didn't do that. All right, counsel. You've exceeded your time. We'll give you a couple minutes for rebuttal. All right. Good morning again. Lisa Ells again for the plaintiffs. I'd like to proceed according to the way that this court proceeded. Could you start with the criminal contempt, if you don't mind? Absolutely, yes. That's fresh on my mind.  So there is no question here that the court took the paradigmatic coercive civil contempt. That is a quote from Parsons. And the court here followed the exact same method that the court followed in Parsons that this court then upheld. They issued a prospective conditional fines in February of 2023 saying, I'm going to give you a grace period of a month. I'm going to give you three months after that. And if you can for any of those months be in compliance, we won't have any contempt proceeding at all. But if not, I'm going to start accruing fines. And those are prospective under Bagwell. Bagwell explicitly discusses how for this kind of per diem conditional fine going forward, the purge opportunity is to reduce or avoid through compliance. Go ahead. I'm sorry. The difficulty I'm having with this is that the fines were imposed before contempt finding. Is there a case that permits a court to impose fines before finding contempt? Parsons. Also Salazar in the District of Columbia. Well, that's not good for you. But Parsons is directly on point. In fact, in that case, the court gave even less notice. The court only gave two months notice from comply immediately to fines will accrue starting in two months. Very little notice. There's a lot more notice here. Was there a contempt finding in Parsons first? No. Second, on the second occasion, like six months later. So fines accrued for many, many, many months. And then the court adjudicated contempt. I think it was the initial order saying the fines will start accruing. You have to start immediately complying was October. Two months later, the court said, okay, the fines are accruing. And then I think it was six months after that, in June of the next year, the court adjudicated contempt and said you owe these fines. So all of that directly on point. The same process the court used here. And Parsons, as well as local iron workers, local 433, which is also this circuit's case, both of those discuss why that makes sense. Because for you to have a purge opportunity, for you to be able to come into compliance, you have to have some warning. Counsel, could we go back to Parsons? Yes. So I'm looking at page 452 of Parsons. Yes. The third paragraph. The district court issued an order to show cause. Yes. In which it explained that although defendants have been given wide latitude to revise their remediation plans over the last two years, they failed. And the district court ordered that effectively immediately they shall comply with 11 performance measures and that to show cause why the court should not impose a civil contempt sanction of $1,000 per incident commencing the month of December 17th. So they were given an order to show cause. Exactly the same situation here. That is what the February order did, February 23rd. Was it an order to show cause? Yes. Where in the record can I look to see that the district court fashioned this as an order to show cause? I'll find that site for you, Your Honor. All right. The other question I have about the fines is, am I correct in my understanding that the fines were doubled, the amount of fines was doubled? Correct. And what's the basis for that? What legal basis did the court have to double the fines? Yes. So the fines are based on the actual monthly salary of each of these positions. They're doubled because the monthly salary doesn't account for things like pension and health care and other costs that the state is saving that are beyond salary. But also what Stone says is that it has to be enough to make it hurt. If it's not going to be anything more than the state would get away with anyway, then it's not coercive. It has to be sufficiently coercive. But there has to be some link to the amount. Yes. And the infraction. So that was my difficulty with just doubling it. It looked a little bit like it was arbitrary. Yeah. For the court to just double it without any explanation as to why this amount was the amount that would hurt but was also not more than was warranted by the infraction. And that's a difficulty for me. Yeah. So the same order from February 2023 that is the OSC explains the basis for the fines. That's at ER 1233 through 39. And what the court says in that order is that the fines, again, they take account for the salary savings. The state has already budgeted this money to pay these people. And it's budgeted, in fact, much more than the doubling of fines. The undisputed — there was a filing that was of undisputed facts before the district court that the parties agreed to in advance of the trial. And one of those facts is that the savings is actually much more than the doubling of the fines. Can I ask you this? At what point was there a meeting of counsel to decide how these monies, if paid, would be used? Yeah. So that postdated the contempt order, and it postdated this court's initial denial of the stay motion. So there were a series of meetings in, I believe it was August of this year. And that resulted in the expenditure plan, which, by the way, included many, many, many of the steps that we suggested would have been reasonable for the state to take earlier that it did not take, including, for instance, addressing working conditions. For purposes of our analysis, what role should the ultimate use of any coercive fines be taken into account? It sounds like they're just asking, requiring the court, I mean the state, to do what you believe they were supposed to do in the first place. Yes. So the contempt order makes clear that the way the fines will be used is to essentially go toward improving the staffing in the prisons. But then it left to the discretion, the state, to the state to develop exactly what it intended to do with that money. So, again, I think the sort of import of that is under Bagwell you look at what the character of the contempt order was, the character of the fines, and the use of the fines is very clearly coercive. And in a way, it almost seems like since the state has some discretion on how this is used and it's supposed to be used for the state's obligation, that's another purging mechanism. Is that right? Yes. I think, Your Honor, and I want to just take a step back to all of the purge opportunities. Even after the trial, the state could have reduced or avoided fines. Again, that is the Bagwell standard for purging. It is not paying nothing. They could have reduced by either coming into compliance or the district court issued a tentative and said, look, here's what I'm going to do. I'm going to fine you. But I'm also going to give you time with a circuit mediator to try and show me that you have the will and determination to come into compliance. The clear implication of that is that there wouldn't have been any fines. There wouldn't have been a contempt order if they had taken advantage of that opportunity. Counsel, could you point me to ER 1233-39 for the order to show cause language? Could you point me to the precise language there that sets forth an order to show cause? Your Honor, I'm not sure that it uses the words order to show cause. Okay. Normally it's a precise order. Yeah. Judges know how to do orders to show cause.  And it's usually a separate document that sets forth the order to show cause. Okay. So that's the one question. The second is, point me to the language in 1233-39 that explains why the fine was doubled. Your Honor, it's at ER 1235-36. Okay. What's the language? I don't see an explanation for why it's doubled there. Your Honor, I may need to check a second to check our briefing because it may have actually been in a later order. It's certainly in our briefing. If you look at our answer in briefing. I don't look at the briefs for answers. I look at the record for answers. Apologies, Your Honor. I don't have that exact information. All right. That's fine. It was explained by the court in one of the orders leading up to the actual contempt order. And notably in their reply brief, defendants do not take up the argument that the fines were not properly counted. But that's a question I have. Fair, Your Honor. And I apologize that I don't have the exact citation for that. Thank you. Your Honor, I think that unless there are further questions on this criminal contempt portion, I would like to just point out that every one of the cases the defendants cite are very clearly determinative fines that were retrospective. They were issued for things that at the point the fines were levied, there was nothing that could be done to change the behavior, to come into compliance. That's very different than the situation we have here. Bagwell talks about how you can cut off the fines for a conditional coercive civil contempt by complying. And at that point, your future fines will be forgiven even if your past fines were not. And that's at 829 of Bagwell. There's also a star footnote explaining the same concept. You can cut off future fines, but like imprisonment, you don't get the time you served back because you turn over the keys on day 10. Those 10 days are gone. So I'd like to turn quickly to impossibility. Just a couple of quick points. Rylander, which is a Supreme Court case, makes it explicit that it is literal, physical compliance. That is the standard for impossibility. Moreover, Rylander makes very clear it is the contemptor's burden of production to affirmatively show through clear, through conditional and detailed evidence, that impossibility was literally impossible. You could not have done it. None of the cases that the State has cited, including Falstaff, concern anything less. Falstaff was a situation where the contemptor had lost the documents, essentially, that were required to be turned over from a protective order. And the other side that wanted the documents back performed a full investigation, depositions, everything authorized by the court, and they agreed looking any further is futile. No one can find these documents. They're gone. So from your perspective under Rylander and indeed some of our cases, substantial compliance is not the measure. It's literal compliance. Yes. That's specific to the impossibility defense. That's what I mean, impossibility. Yes, literal impossibility. It's very clear. Not a single witness of theirs testified to literal impossibility. In fact, Dr. Mehta said it was possible to comply, and Dr. Grulich similarly testified that she has no opinion as to whether it's possible to comply or not. She didn't affirmatively refuse to say it was impossible to comply. Stepping towards the reasonable steps the state could have taken, in addition to the working conditions that we've already discussed, which very clearly could have been addressed, there are some many, many, many other uncontested facts that the state didn't take until after being found in contempt. Rolling out a hybrid program. They knew as of 2020 that psychologists and social workers valued during the pandemic the opportunity to work remotely. And nonetheless, even as they watched those clinicians specifically walk out the door in the three years following, they didn't implement a hybrid policy until August of this year. Opposing counsel says when they tried to fully implement teleworking that you all objected to it. Yes, so there are two slightly different things that do kind of overlap. Hybrid is partially working.  So they are developing a hybrid program as we speak. Separately, on the telemental health, they have already begun rolling out a program. So although we're disputing the contours of it in negotiations right now, that program exists. They're filling clinical roles through that program. But the question is, do you object to, for instance, that they wanted to go fully telehealth for mental health visits? Would you object to that? I think we probably would, but they're not even proposing that. They're proposing 100 total clinicians through their telemental health program. I thought I heard the state attorney said that you all put the kibosh on them going more fully telehealth. He can address that when he comes back, but I thought that was his position. No. First of all, there's two separate policies. The telepsychiatry policy has been in place for years, and they've had great success with that. But is there a limited number? That's the point. Are there a limited number of psychiatrists that you will accept as providing clinical services to the inmates? Yes, there are limitations, but 75% of the class is treated by telepsychiatry right now, and they have open positions in telepsychiatry, so they can't even fill the positions that they have. It's not like an expansion would help them here. But as to telemental health, the most important part is that they, again, in 2020, when their psychologists and social workers said, hey, we love this remote work, just like everybody else in America, they gave them the opportunity to do that. Dr. Gulich testified it was a great option, and then they cut it off, and then they watched those clinicians walk out the door over the next three years. They didn't do anything to initiate a telemental health program until June 2023, four months after the order to show cause or the fine structure, the order in February 2023 that gave notice of possibly impending fines. So that's another situation where they waited until the end, until after contempt. They could have done that three years earlier. They knew their telepsychiatry program had been a great success, but, again, they did nothing. They sat for three years. Another great example is they have recently expanded the type of clinicians that can treat Coleman class members to include marriage and family counselors. Again, they did that after the contempt order. There was testimony during the trial that they had tried using those clinicians before but aborted the efforts. They are treating patients in other capacities in CDCR right now. They didn't do anything with that until after the contempt order. There are 34,000 marriage and family counselors in California. That is a great pool that we stipulated, by the way, and the court approved their ability to use those clinicians to treat class members. They didn't do that until after contempt. Another example is I think maybe the easiest example to understand is for compensation, they didn't even keep up with inflation. It is uncontested, and the court makes that finding, that it is uncontested their wages did not keep up with inflation in the years following the pandemic. So, again, however much they say they're paying above premiums above California wages, which, by the way, they're not paying anything above California wages for medical assistance, a category in which they're 71% compliant, would be pretty easy to raise those salaries and improve care. But turning back to the other categories, however much they're saying they pay above the California wages as a premium, they're not even keeping up with inflation. So the actual cost to people, to the clinicians, is getting harder and harder to pay their money and pay their rent and food, right? Another thing they could have done. So, anyway, there are many, many, many examples. Hiring time takes six months, six months, 108 business days. There's no way you can compete in a market like that, and that is true at 31 out of 32 prisons. At one prison, they've reduced it to four months, only at one. So, anyway, there are many, many, many opportunities here that they could have taken that they did not take. They've done many of those things after being held in contempt. That's not sufficient to avoid contempt. It is improving compliance in some respects, which is great. But that, again, doubles down and shows you that it's coercive, civil contempt. It's not criminal. And as to, finally, as to substantial compliance, unless the Court has further questions. I do, but go ahead and finish. Great, okay. As to substantial compliance, so in Ray Duldeck, this Court's decision, the main decision in this circuit on what it means to have substantial compliance in this context, it allows for minor technical noncompliance only. That is what substantial compliance is, minor technical noncompliance. As you've alluded to earlier, the cold, hard facts are that we're nowhere near that. We're not talking about being a couple of percentage points below whatever the threshold you're saying it is. They are at 41% empty, 41% vacant for psychologists, 43% vacant for MAs, social workers almost 30%. These are not in the realm where there is anything near substantial compliance. And the holistic test that defendants keep referring to, you know, it's a 74-page opinion. It's a pretty holistic analysis, and the Court has found that they're just nowhere near compliant. And even defense counsel does not contest that. There's never been a month in which they've been compliant. So substantial compliance is kind of a red herring here. All right, Kelsey, I wanted to ask you, as a practical matter, what happens if we affirm the district court's ruling? What happens? Do the fines just keep accumulating until all of the vacancies are filled to the court's satisfaction? Where do we go from here? Yeah. I mean, the first thing that happens is that the expenditure plan that defendants came up with to try and use the money that's accumulated to date will actually get spent. You know, in that expenditure plan, it promised bonuses, and those bonuses were going to hit before the holidays. And because of the stay order, they're not. So people knew they were going to get money. They planned on it, and they're not getting it. And I think if you want to talk about retaining people, promising them money, and then taking it away is a great way to lose people. Well, but so the money will be spent. And if that doesn't bring the vacancies to the rate that the court has set, then more fines would be imposed. And at some point, would the fines ever cease? Would the fines only cease when these vacancies are to the point where the court ordered? Is that what you envision? Yes, that's what we envision. And, frankly, I think it's entirely possible. They've made a number of great steps, again, after the contempt finding, to do things that really will improve their ability to hire and retain people. So I don't think it's impossible. No one here thinks it's impossible. For the contempt trial, they had to hire 18 medical assistants to be in compliance. It's hard to imagine how that's impossible. All right. Thank you, counsel. We'll give you two minutes for rebuttal. Thank you, Your Honors. I want to start with Parsons and with the not order to show cause. So there was no order to show cause issued in February 2023. It was just a prospective fine schedule. But Parsons is distinguishable for a different reason as well as that one, and that's Parsons said these fines are compensatory. They are to fix injuries to the plaintiff class. And because they were compensatory, and they were also partially coercive, but mostly because they were compensatory, Parsons says these are civil and not criminal. But here, nobody, the district court, plaintiffs, at any time have said the $170 million based off of double the salary, the average maximum salary for providers is compensatory. And that's because they can't claim that, because compensatory civil sanctions have to be calibrated to some showing of harm. Cases in this court say that. Bagwell says that. The Supreme Court's decision in Goodyear says there has to be a causal relationship. And there was just no evidence on that. And then I would also like to say that Bagwell specifically talked about these prospective fines schedules, and it said that doesn't make something coercive because that's just coming into compliance. And Bagwell makes clear that a purge opportunity has to come subsequent, after the contempt order, after the fines have been imposed. And that didn't happen here. There was $120 million in backwards-looking fines that were retrospective, and defendants had no ability to purge them. Plaintiffs admit in their briefing that that $120 million is unconditional and determinate, and there's no post-contempt opportunity to purge it. And that puts it squarely within Bagwell. But does that make a difference that the funds are going to be used to remedy the issues that the court had with the mental health treatment? That doesn't make a difference? I don't believe it does, Your Honor. I'm not aware of any decision that says the district court's use of the funds allows it to fine any amount it wants, unrelated to a harm or anything else. And that's exactly what the district court did here. It could be up to $1 billion in five years if defendants continue to be unable, because of external factors, to frustrate — sorry, external factors, to fully comply with the court's orders. And then I think I'm over time, so I'm — Yeah, you can sum up. Thank you. So defendants asked that this court reverse the district court's contempt orders because it did not provide defendants criminal due process protections they were entitled to before imposing nearly $170 million in fines, plus millions more every month, when defendants are unable to comply with the staffing orders. So what — do you envision that we would just tell the district court that the fines were not permissibly imposed, and then we would be back to square one, where the district court would be trying to get compliance with this order? What good is that? I think it's a lot of good. The first is defendants get the due process they're entitled to. But the district court had lots of options short of fining defendants $170 million. If the district court believed that the various measures, which were not defendants' measures in the spending plan that was subsequently adopted by the court, if the district court believed those were the right steps to bring down the compliance rate, it could have issued an injunction. It could have told defendants to use that money in those ways as long as it complied with the PLRA. Or if the district court believed that working conditions were the problem, it could have issued an injunction to do that. But was it required to do that? This is a discretionary decision. And the district court — oh, I mean, the history of this case, the district court has worked with the state over the years to try to get compliance, even went to mediation. The Ninth Circuit mediators are the best in the country and were not able to get a resolution of the case. It's just the district court tried a number of ways to resolve this case. Sorry, Your Honor. The district court was not required to issue an injunction, but those were other least possible measures that the district court could have used to create compliance. $170 million with no reference to any reasonable compensatory fines or anything else is just not the least possible power. And I will just say about the Ninth Circuit mediator, Bagwell says that is not enough specifically because defendants did not have keys to their own prison when they go to a mediation. Instead, they had to agree with plaintiffs, and then likely the special master had to approve, and then ultimately the district court had to approve. I understand that, but I know our mediators are just really great in terms of bringing people to the table and resolving things. And so that speaks of volumes to me that they weren't able to do it. But that, of course, that has legally no significance in this case, but it's just something that stood out to me. All right. Thank you, counsel. Thank you to both counsel. The case just argued and submitted for a decision by the court, and we are adjourned. All rise.
judges: TASHIMA, RAWLINSON, SMITH